**154 So. 443**

### LELAND v. LELAND.

No. 32205.

March 26, 1934.

Rehearing Denied April 23, 1934.

Ernest J. Robin, of New Orleans, for appellant.

Guy D'Antonio, of New Orleans, for appellee.

O'NIELL, Chief Justice.

Mrs. Leland sued for and obtained a decree of separation from bed and board, on the ground that her husband was so habitually intemperate as to render her living with him intolerable. She was awarded also the temporary care and custody of their daughter, 5 years of age, and alimony at the rate of $87.50 per month. Mr. Leland has appealed from the decision.

The only question is whether Mr. Leland's habitual intemperance and his conduct towards Mrs. Leland when he was intoxicated was of such a nature as to render her living with him intolerable. There is no doubt—and in fact not much dispute—that he was habitually intemperate during the last three years previous to his wife's leaving him and bringing this suit. It is very much to his credit that he did not drink intoxicants to excess during business hours, or from the time of his retiring for the night until the next day's work was done, or allow his drinking to interfere with his business. In fact the evidence justifies the conclusion that, when Mr. Leland had business to attend to, he did not drink intoxicants at all during the business hours, or from the time of his retiring at night until the end of the next day's business. If he had been as thoughtful of domestic happiness as of success in business, as Dorothy Dix so well explains in her wonderful philosophy, there would be no lawsuit. Mr. Leland's record and reputation for being an efficient and courteous and trustworthy salesman is established by the testimony of thirteen prominent business men who had frequent dealings with him and by the testimony of four neighbors who saw him almost every day. But none of these seventeen witnesses for Mr. Leland ever attended any social function with him, or visited at his home, in New Orleans, during the period of three years previous to this lawsuit; and none of them knew anything about his habits at home or at night. There, and at social functions, is where his habitual intemperance was indulged in, and there is where the indulgence made him offensive to Mrs. Leland. That fact is proven by her testimony and by that of her brother, who was a boarder in the house, and by the testimony of her sister, who was a frequent visitor, and by the testimony of two married couples, who, with Mr. and Mrs. Leland, formed a coterie of bridge players, who met often at the members' homes. Their testimony is not contradicted by any one except Mr. Leland, and by him it is contradicted only in some minor details. With regard to these bridge parties in the homes of the members of the coterie, Mr. Leland admits in his answer to the suit "that he occasionally over-indulged, but," he avers, "that he was never drunk to such an extent that he did not know what he was doing." The other players in the bridge games, who testified in the case, did not concur in the latter statement. Logically, a man under the influence of liquor cannot judge as accurately as his sober associates can judge whether he knows what he is doing. In fact, it is not often that a man will admit that he was ever so drunk that he knew not what he was doing, except perhaps as a plea in defense of some indiscretion on his part. Besides, we take it as a matter of common knowledge that a man might be so intoxicated as to make his condition intolerable, or "insupportable," as the Civil Code (art. 138) puts it, without being so far gone as to know not what he is doing. More than a hundred years ago, Thomas Love Peacock, writing of The Misfortunes of Elphin, gave a definition which seems very favorable to the defendant in a case like this, viz.:

"Not drunk is he who, from the floor,
Can rise alone and still drink more;
But drunk is he who prostrate lies,
Without the power to drink or rise."

But times have changed since that was written, and we must change with them. Tempora mutantur et nos mutamur in illis. It is conceded now, by the best informed, that the term "drunk," like the condition itself, is not only indefinite but utterly indefinable, like the haze between daylight and darkness; so that, whether a man who has taken a few drinks is to be adjudged drunk or sober depends mainly upon the time and place and circumstances—and particularly upon the company—selected for the occasion, either willfully or woefully. Besides, we must bear in mind that the ground or justification for a separation from bed and board, in that respect, is, according to article 138 of the Civil Code, "habitual intemperance," which is perhaps a milder term than "habitual drunkenness." According to the first section of article 9 of the Constitution, that is one of the offenses for which a public official may be removed from office, from which we infer that the lawgiver intended to make a distinction between the penalty for, or legal consequence of, "habitual intemperance" and "habitual drunkenness," having reference to married persons, and to those holding public office.

Mr. Leland pleads, in justification of his condition and conduct at the bridge parties, that he attended them reluctantly, and only to please Mrs. Leland, knowing that liquor was served always and in profusion at such parties, and knowing that he could not stand more than a few drinks without being immediately affected thereby, "whereas his said wife had the capacity of imbibing double the number of drinks with apparently no effect upon her." The record, however, shows that Mrs. Leland seldom imbibed more than one drink, and never more than two drinks, at such parties, and in fact that there were never more than two rounds of drinks served at any such party. The record shows also that Mr. Leland usually drank too much before arriving at the party, or before his guests arrived, if the party was at his house, and that he drank more at such parties than was served to the others present.

Without going into embarrassing details, it is sufficient to say that the evidence is convincing that Mr. Leland was given to habitual intemperance nearly all of the time that he spent at home, for at least three years, and that, in his intoxication, his conduct towards Mrs. Leland became intolerable. She did not, by example or otherwise, encourage or condone his drinking, but, on the contrary, warned him many times that she would leave him if he would not quit drinking to excess; and she appealed to his father to induce her husband to reform. He was never physically cruel to her or to any one else; but the whisky in him made him cruelly reproachful of her and objectionable to polite society. It aroused, as whisky often arouses, an unjustified suspicion; and it exemplified, as whisky does sometimes exemplify that:

"Trifles, light as air,
Are, to the jealous, confirmations strong
As proofs of Holy Writ."

It is gratifying to observe that Mr. Leland, living with his parents ever since this suit was brought, has abstained from drinking intoxicating liquor. Hence we express the hope that, with his excellent business rec-

ord, and with the knowledge of his weak spot, he and Mrs. Leland may reconcile their troubles in the year of probation which the law allows. That is the primary purpose of the law, and, if it fails in this instance, it will not be likely that an annulment of the decree of separation from bed and board would have had a better result. "O God, that men should put an enemy in their mouths to steal away their brains!"

There is nothing in the record in this case to justify a reversal of the conclusion of the judge who tried the case, on the question of fact, which was the only question in the case.

The judgment is affirmed.

ST. PAUL, J., absent.