JANVIER, Judge.
Plaintiff is the holder of a check drawn by the nominal defendant, United States Steel Products Company. The check is payable to the real defendant, Southern Transfer Co., Inc,, and is endorsed in the name of the said Transfer Company by A. H. Phillips, the President of the company. It was cashed for Phillips at his request by the plaintiff, Henry Kothmann. The amount of the check is $947.87.
There is no doubt whatever that the testimony of Mr. Maumus Claverie, the district manager of the United States Steel *859 Products Company, sets forth the true facts so far as his corporation’s actions are concerned, but it is made very evident that this company has no real interest in the outcome of the controversy and that the parties at interest are Kothmann, the plaintiff, who cashed the check, and Southern Transfer Co., Inc., the payee, whose president endorsed it and received the proceeds from Kothmann.
Kothmann, at the time at which the check was cashed, operated a notorious drinking and gambling establishment, located at Henderson Point, West Pass Christian, on the shore of Bay St. Louis, Mississippi, and A. H. Phillips, the President of the Southern Transfer Co., Inc., was a more or less frequent visitor in Kothmann’s establishment.
It is alleged by Kothmann that he is the holder and owner of the said check for value, and that he received it in due course. It is further alleged that the maker of the check, the defendant corporation, United States Steel Products Company, stopped payment thereon on or about March 25, 1950.
The defendant corporation, United States Steel Products Company, admits the issuance of the check, but denies that Koth-mann is the holder and owner in due course, and expressly denies that A. H. Phillips, who endorsed the check in the name of the payee corporation and who cashed it, was authorized and empowered to endorse or to cash the said check. The defendant further admits that it stopped payment on the said check and that it did so at the request of Southern Transfer Co., Inc., the payee. It further avers, on information and belief, that the plaintiff, at the time of the cashing of the check, was “engaged * * * in the operation of a saloon and gambling resort in the State of Mississippi,” and that, at the time “of the alleged transaction” Phillips “had been drinking heavily for some time and was plainly intoxicated, a fact well known to the plaintiff and his partners, associates, employees and representatives, who were operating the saloon and gambling resort,” and that although plainly intoxicated, Phillips “was permitted to drink and gamble,” and that, after Phillips lost a substantial amount of money, the plaintiff, Kothmann, cashed the check described in the petition, amounting to $947.87, “knowing, at the time, that the said Phillips was intoxicated and was using the proceeds of the said check * * * for the purpose of continuing his gambling operations, * * * Defendant then averred that the operation of such a resort was “in direct violation of law and that the entire transaction was tainted with fraud” and that Kothmann knew that the said Alex Phillips was too drunk to realize his illegal act in endorsing said check and cashing same and using the proceeds to gamble. And the defendant further alleged that, under the laws of the State of Louisiana and under the laws of the State of Mississippi, such a transaction is illegal, null and void.
When the matter was called for trial counsel for plaintiff moved “for a judgment on the record.” After hearing argument, the judge a quo stated:
“Without passing on the question of whether or not the plaintiff’s argument is correct, I feel that the matter is up for trial and since all the witnesses are here and available, some of whom I understand have had to come from Mississippi, and to avoid having the matter sent back and have it come up all over again, reserving all rights that counsel for plaintiff may have under his motion I am going to overrule it at this time.”
After a trial on the merits there was judgment in favor of plaintiff as prayed for, and defendant has appealed.
Rather to our surprise, when the matter was argued before us, counsel for plaintiff stated that he would concede that, if the record showed that at the time of the cashing of the check Kothmann knew that the proceeds were to be used in gambling or to pay a gambling debt, that defense might be set up by the maker of the check, and that accordingly the only real questions in the case are whether Kothmann knew that the proceeds were to be used in gambling or to be used to pay a gambling debt, *860 and whether the record shows that, as a matter of fact, the proceeds were so used. We say that we were surprised at this concession of counsel for plaintiff, because it would seem that the burden .of the argument of counsel in support of the motion for a judgment on the record was that the defense, which is made here, is not available to the drawer of the check and could be set up only by the endorser. ' •
As a matter of fact, the trial judge in his reasons for judgment reached the conclusion that the defense relied on was not available to the nominal defendant, United States Steel Products Company, for he said:
“The Court feels that, except for the application of the laws relative to negotiable instruments, the defendant would be entitled to a judgment under its defense of gambling and, possibly, also under its defense of lack of authority on the part of the President of the payee corporation to endorse for the corporation. Rut in view of the fact that the record does not reflect that the payment of this check by the defendant will in any way deprive the defendant of any of its rights as against the payee, the Court feels, that the defendant is without any right to contest the plaintiff’s ownership of the check by setting up defenses' which ordinarily would be available to the payee and that the plaintiff, therefore, is entitled to the judgment he prays for.”
However, counsel for both parties take the position that the question on which a determination of this controversy hinges are (1) whether or not Phillips was so intoxicated that he did not know what he was doing, and (2) whether Kothmann knew that the proceeds of the check were to be used in gambling and were so used. We therefore pass on to a consideration of these questions of fact.
We find ourselves unable to agree with our Brother of the District Court that the record shows that “this transaction took place * * * at a time when said transfer company president was intoxicated and actually engaged in gambling.”
Of course, it must not for a moment be conceded that, among those things'of which we are assumed to have judicial knowledge, there may be included the character of such an establishment as that iri which this transaction occurred or the occurrences which are customary in such an establishment. But if we could persuade ourselves-that we have knowledge of what customarily goes on in such an establishment, that, would not be sufficient to justify a holding, unless there was evidence to support it, that in this particular case the possessor and endorser of the check engaged in gambling and in that establishment used the proceeds of the check for such a purpose to the knowledge of the plaintiff. Even had we-knowledge that it is customary to gamble-in such an establishment and, whatever may-have been the actual facts surrounding the-occurrence, there is not one scintilla of evidence in the record to show that Phillips used the proceeds of this check for gambling.
On this issue the defense is based solely on the theory that, because Phillips is shown to have had in his possession during the course of the evening so large an amount as he did possess, he must have lost it all in -this particular establishment in gambling, and that he must have done so to-the knowledge of Kothmann. It is admitted that, in the immediate vicinity, there were-two other similar establishments devoted almost entirely to the wants of drinkers and gamblers.
We cannot overlook the fact that although Phillips showed a complete willingness to say whatever he thought might best suit his interests, at no time did he say that he had lost this money in gambling. In. fact, he persistently stuck to the story that he had been so drunk that he did not know what he had done that evening. He said that he did not know that he had cashed this check and thought that he had lost it until some time later when it appeared in. the possession of Kothmann. His story is-contradictory in the extreme, for although at-one stage of his testimony he contended that it was some time later that he learned that he had been gambling and had cashed: this check, .at another point he said that a *861 friend of his, a Willie Bahr, told him of most of the occurrences on the very next day.
We find it strange too that, although his friend, Bahr, who was with him from early that morning until the next morning and who knew practically every detail of what had occurred during that twenty-four hour period, was not produced as a witness and no effort was made to obtain his testimony. The reason given is that Bahr lived in Spanish Honduras and that therefore his testimony could not have been obtained. Since Phillips knew where Bahr lived, it would not have been difficult at all to have obtained his testimony by deposition.
Another person who could have given testimony as to the condition of Phillips was Bravo Woodcock, the Chief of Police of Gulfport, Mississippi, who, according to Phillips, took him to the establishment of the plaintiff. Defendant also failed to produce Mrs. Phillips, although according to Phillips his wife came to get him after the unfortunate occurrence. Surely -she could have testified as to his condition at that time.
Analyzing a little further the contradictions in Phillips’ testimony, we find that he claims that he was a diabetic and could not touch liquor. No doctor was. produced to substantiate his testimony, but in spite of the fact that he says that he could not touch liquor, only a little later he stated that he had often been in the establishment of plaintiff and when he said that he never gambled there, he was asked why he went into the establishment, and he answered: “I have had quite a number of drinks there * * *_»
The fact of the matter is that the testimony of Phillips is a confused mass of contradictions and misstatements. ■
The argument of counsel for defendant, that it must have been realized by Koth-mann that Phillips was engaged in gambling on that night because of the rather large amounts of money Phillips had in his possession, is based on the following facts:
At some time in the afternoon or evening before Phillips cashed the check on which this suit is based, he had asked Koth-mann to cash for him his personal check for $1,000. Kothmann admits that he cashed this first check and that later, when Phillips came back to his establishment, Phillips told him he had lost the $1,000 in gambling and that he needed more money, so that he might-go to New Orleans. It was then that Phillips produced the check now sued on. Kothmann says that Phillips told him that he did not want to cash another check (meaning his own personal check). Kothmann sets forth the facts of that particular transaction in the following testimony:
“At the time he asked me to cash this second check, I did not want to cash the check for the reason that it was my idea, or opinion, that he had spent enough money for the afternoon, no matter whether ,he. gambled it' or drank it up. I have often stopped people from cashing too many checks, and going too strong and not knowing or realizing how they were doing.
“Q. What did he say to that? A. He said he wanted some money to go backto New Orleans and he did not want to cash another' personal check. He said ‘I have a''check here that you won’t have to worry about/ and he produced the United States Steel Company check and he said, ‘You know that would be good.’ I said, T would not have any doubt about it’; and he said ‘You know this is my company’. At the time I did not realize that ‘Inc.’ on the check meant more than one person. I have known Mr. Phillips for years, and have done business with him for years, so I accommodated him — I cashed the check for him; and the denominations of the bills were all-sized bills. Then he went out the front door.”
Counsel argüe ‘•that it thus appears that Kothmann knew that Phillips had nearly $2,000 in his possession during the evening, and that he also knew that Phillips had lost the first $1,000 in gambling, but Kothmann’s answer is that it was then that Phillips told him that he needed the money to go to New -Orleans, and Koth- *862 mann added that right after that Phillips “went out the front door.”
And there is not a word of evidence which to any extent tends to overcome the testimony of Kothmann. All that is said is that it must be presumed that Phillips was gambling and that Kothmann therefore must have known that he intended to use and did use the proceeds of this second check for that purpose. However suspicious the circumstances may have been, it is necessary that we have more than mere suspicion in order to reach the conclusion desired by defendant, that the money from this check was to be used in gambling to the knowledge of Koth-mann.
When we approach the question of whether the condition of Phillips was such that Kothmann should not have cashed his check, again we find that the evidence does not justify the conclusion desired by defendant. Both Kothmann and his bartender, Bishop, admit that Phillips had had some drinks, but they both say that he seemed to know just what he was doing. We repeat that the failure of the defendant to produce any of the available evidence as to the condition of Phillips weighs heavily against the contention that he was so intoxicated that he did not know what he was doing.
The burden of proving this condition was on the defendant. In Volume 17 C.J.S., Contracts, § 605, p. 1256, appears the following :
“One who alleges the mental incapacity of a party to a contract must establish it by a preponderance of the evidence. A plea of drunkenness should never be sustained except on convincing proof that the alleged drunkenness was so complete at the time of making the contract that the party was bereft of his mental faculties. * * * ”
In Volume 12, American Jurisprudence, section 144, page 637, it is said that:
“ * * * Equity will not assist a man to avoid a contract which he has entered into when drunk, merely because when in his sober senses he may wish he had not entered into it. j}j »
Chief Justice O’Niell, in Emerson v. Shirley, 188 La. 196, 175 So. 909, 913, had the following to say on this question:
“It is obvious that the plea of drunkenness, as a ground for annulling a contract, is one which may be readily abused. Hence the plea should never be sustained without convincing proof that the alleged drunkenness was so complete that, at the time of making the contract, the party was bereft of his mental faculties. Drunkenness is not a well-defined term. Leland v. Leland, 179 La. 533, 154 So. 443. It is a matter of common knowledge that, by force of habit, or as an accomplishment, some men can attend to their business successfully while very much under the influence of liquor. We are not referred to any case in this state where a contract has been annulled at the instance of one of the parties on the ground that he was drunk when he made the contract; and we take it that the courts will be reluctant to sustain such a plea except in cases where the intoxicated party was imposed upon or made a sacrifice by reason of his drunkenness. * * ”
When we come to consider the question of the effect of the endorsement by plaintiff, we note that counsel agree that in Mississippi, as well as in Louisiana, the Uniform Negotiable Instruments Law has been adopted and from it, LSA-R.S. 7:52, we find the following:
“A holder in due course is a holder who has taken the instrument under the following conditions:
“(1) That it is complete and regular upon its face;
“(2) That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;
“(3) That he took it in good faith and for value;
“(4) That at the time it was negotiated to him he had no notice of any *863 infirmity in the instrument or defect in the title of the. person negotiating it.”
We are concerned only with the requirements that the holder of the instrument must have taken it in good faith and for value and without notice of any infirmity in the instrument or defect in the title of the person negotiating it. There is no question that value was given.
It is argued on behalf of defendant that Phillips had no authority to endorse for Southern Transfer Co:, Inc., and that therefore his endorsement did not transfer the instrument to Kothmann. That argument overlooks two facts — first, that, as a matter of fact, Phillips did have authority to endorse for his company, and second, that even if he had no such authority, the burden was on the defendant to show such lack of authority.
As to whether Phillips in fact had such authority, the record shows that there was no resolution of the Board of Directors of his company either granting to him or withholding from him the authority to endorse, but we do find that he was the President of the company and that the bank in which the company deposited its funds was authorized by resolution of the Board of Directors to honor checks signed by Phillips alone. Furthermore, when Phillips was questioned as to various matters concerning the operation of his company, the question of who paid his salary to him came up, and he said that he paid it to himself for the reason that “there is no one else to pay me.” He obviously meant that he handles all of the financial affairs of the company. However, as we have already said, even if this were not true, it is clear that Kothmann did not know that Phillips had no authority to endorse, and, in the absence of proof of such knowledge, it must be presumed that he acted on the belief that such authority existed, for the Negotiable Instruments' Act itself, LSA-R.S. 7:59, provides the following:
“Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course. ‡ *»
There is no necessity for such a holder to assume the burden of proving that such authority did actually exist until there is first offered proof to the effect “that the title of any person who has negotiated the instrument was defective”. No such evidence is to be found in this record.
We therefore repeat that, whatever may have been the real fact as to Phillips’ condition or as to what he intended to do with the proceeds of the check, there is nothing in the record except suspicion from which we could possibly reach the conclusion that Phillips gambled with the proceeds and that Kothmann knew that he intended to do so.
We have treated the matter as though Southern Transfer Co., Inc., is the real defendant, and we have done so for the reason that when Phillips’ asked the United States Steel Products Company to stop payment on the check, that corporation required him in writing to state 'that it would be held harmless against any loss resulting to it and that it was only after it received this agreement that it issued the second check in payment of the debt which it had owed to Southern Transfer Co., Inc., and which was completely satisfied by the issuance of the first check.
Since we conclude that Kothmann cashed the instrument for value in good faith and before maturity, it necessarily follows that the judgment of the district court was correct.
Accordingly, the judgment appealed from is affirmed at the cost of appellant. Affirmed.
REGAN, J., absent, takes no part.